# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>    v.<br><br>HENRI SALVADOR GUTIERREZ,<br>   A/K/A "PERVERSO";<br><br>ELISEO VAQUERANO CANAS,<br>   A/K/A "PELIGROSO";<br><br>JONATHAN TERCERO YANES,<br>   A/K/A "DESALMADO";<br><br>DJAVIER DUGGINS<br>   A/K/A "HAZE,"<br><br>          Defendants. | Case No. 18-cr-10450-MLW |

## OMNIBUS OPPOSITION OF THE UNITED STATES TO MOTIONS IN LIMINE REGARDING CO-CONSPIRATOR STATEMENTS

The United States files this omnibus opposition to (1) the "Motion in Limine to Preclude Hearsay Testimony of Alleged Co-Conspirators Made to Government Agents, With No Available Hearsay Exception Under F.R.E. 801(d)(2)(E)," filed by defendant Djavier Duggins (Dkt. No. 334) ("Duggins Motion") and (2) the "Joint Motion in Limine to Exclude Statements Made by Salvador Gutierrez to CW-13," filed by defendants Eliseo Vaquerano Canas and Jonathan Tercero Yanes (Dkt. No. 357) ("Canas/Yanes Motion").

Faced with devastating statements of guilt incriminating them in the charged racketeering conspiracy, Duggins, Canas, and Yanes raise a host of arguments in the desperate hope of excluding this damning evidence from the jury's consideration. The challenged statements are not hearsay for a variety of reasons and are admissible against all defendants, including admissible as co-conspirator exclusions to hearsay. Both the Duggins Motion and the Canas/Yanes Motion should be **DENIED**.

## FACTUAL BACKGROUND

The motions filed by Duggins, Canas, and Yanes implicate three different recordings of co-conspirators made by three different cooperating witnesses:

*First*, a recording made on October 24, 2018 by CW-13, which captured statements by co-defendant Henri Salvador Gutierrez a/k/a "Perverso," the draft transcript of which is hereafter referenced as "Oct. 24, 2018 Recording."[1]  Both the Duggins Motion and the Canas/Yanes Motion challenge the Gutierrez statements on this recording.

*Second*, a recording made on April 18, 2015 by CW-1, which captured statements by co-defendant Erick Lopez Flores a/k/a "Mayimbu" and others, the draft transcript of which is hereafter referenced as "Apr. 18, 2015 Recoding."  Only the Duggins Motion challenges the statements by Lopez and others on this recording.

*Third*, a recording made on December 29, 2017 by CW-17, which also captured statements by co-defendant Lopez and others, the draft transcript of which is hereafter referenced as "Dec. 29, 2017 Recoding." Only the Duggins Motion challenges the statements by Lopez and others on this recording.

Additional factual background is incorporated, as needed, in the arguments below.

---

[1]     Duggins filed a number of exhibits under seal.  *See* Dkt. No. 335 ("Motion to Seal the Exhibits to First Motion in Limine").  However, the draft transcripts of the CW recordings were filed on the public docket as Dkt. Nos. 334-1 (transcript of Oct. 24, 2018 recording), 334-3 (transcript of April 18, 2015 recording), and 334-4 (transcript of Dec. 29, 2017 recording).

The government believes that these transcripts should also be sealed for now. (Among other things, the government originally produced these draft transcripts to the defendants pursuant to the Protective Order governing discovery).  The government has asked Duggins to file a motion to seal these three exhibits, and Duggins has indicated that he will submit that filing tomorrow.  It is unclear how that filing will affect the numbering of the exhibits to the Duggins Motion.  For present purposes, to avoid confusion, the government references the draft transcripts of these recordings by the dates of their recordings instead of by the exhibit numbers cited in the Duggins Motion.

## ARGUMENT

## I.     The Statements in Question are Admissible for Non-Hearsay Purposes

As a preliminary matter, it is worth noting that the challenged statements may be admissible as non-hearsay.  If the statements do not constitute hearsay, then they need not fit into any hearsay exception.  At trial, the court will likely have alternate routes to admit the challenged statements into evidence, regardless of the truth of the matter asserted in those statements.  The pending motions contain no discussion of this threshold issue, which, by itself, may allow for the admission of many of the statements.

As defined in the Federal Rules of Evidence, "'Hearsay' means a statement that: (1) the declarant does not make while testifying at the current trial or hearing; *and* (2) *a party offers in evidence to prove the truth of the matter asserted in the statement.*"  Fed. R. Evid. 801(c) (defining hearsay).  When an out-of-court statement is relevant *without regard to whether it conveys accurate information*, such a statement is simply not hearsay as a definitional matter.

Here, many of the challenged statements have relevance regardless of the truth of the matter asserted in the statements.  For example, Gutierrez and Lopez each make statements—they think in confidence to fellow MS-13 members—in which they discuss the ongoing membership of the MS-13 gang, the ongoing activities of the MS-13 gang, and other gang-related topics.  Many of these statements have independent relevance regardless of the truth of the statements themselves because they go to other issues such as the associational relationship between the parties, knowledge, intent, etc.  For example, if Gutierrez or Lopez discuss a past violent attack, regardless of whether that attack *actually* took place, those statements may be relevant in a RICO conspiracy case to show the declarant's knowledge that *some* member of MS-13 would commit two or more acts

of racketeering activity.  In other words, the mere fact that Gutierrez or Lopez knew about or had heard of MS-13 members committing acts involving murder or attempted murder, and they still chose to remain in the gang, is relevant and probative regardless of whether those other attacks were actually committed.

Similarly, those statements may be relevant for other non-hearsay purposes, including to show the associational relationship between co-conspirators, regardless of the truth of the underlying statements.  Statements of identification or statements of associational relationship have independent non-hearsay value.

Notably, in pretrial litigation, the defendants have themselves provided alternate grounds to allow into evidence the challenged statements for non-hearsay purposes. Consider, for example, the numerous assertions that Duggins has made to the court at pretrial hearings and in pretrial filings that his primary defense at trial will be withdrawal. *See, e.g.*, Dkt. No. 94 (Duggins Motion for Release) ("This case in essence can be distilled down to two issues: a) whether the Defendant can affirmatively prove that he withdrew from the enterprise five years before the indictment came down, and b) whether the Government can prove that the defendant rejoined the enterprise (or never withdrew)."). Duggins has repeatedly suggested that he intends to make this a central issue at trial and has repeatedly claimed that he withdrew from the MS-13 conspiracy in 2012.  *See, e.g.*, Dkt. No. 143 (Duggins Reply to Motion for Release) ("Furthermore, and to be more precise in his defense, Duggins has publicly broadcasted his intent to withdraw, as early as ***September 21, 2012*** to a court of law, law enforcement, as well as to his alleged co-conspirators.") (emphasis by Duggins in original).

Putting aside the numerous problems with this defense (and there are many), this defense necessarily calls into question the associational relationship between Duggins

and Gutierrez.  Proving an association-in-fact enterprise is an element of the offense.  As is proving membership in the conspiracy.  Many of the challenged statements by Gutierrez are probative as to those issues regardless of the underlying truth of the matter asserted in those statements.  In one statement, for example, Gutierrez [Perverso] states, "HAZE always told me, 'Look, when you go kill a son of a bitch, dude, invite any other dude except MAYIMBU.'"  Oct. 24, 2018 Recording at p. 34.  Here, Haze [Duggins] is claiming that he withdrew from MS-13 in September 2012, but given Perverso's age and background, *Perverso would have been 13 years old and in El Salvador at that time*.  Putting aside the truth of the matter asserted in the statement above—*e.g.*, whether Haze actually told Perverso not to invite Mayimbu to a murder—the very fact that Perverso knows someone named "Haze," the alias of Duggins, is probative of whether or not there was an association-in-fact between the charged co-defendants.  That statement has non-hearsay evidentiary value regardless of the truth of the matter asserted therein.

Similar examples abound.  For example, Perverso's statement that after the murder of Herson Rivas, Haze went to the scene of the murder to see if there were any cameras may be admissible for non-hearsay purposes, regardless of the truth of the matter asserted.  Regardless of whether Haze *in fact* went to the scene to see if there were any cameras, the mere fact that Perverso heard that information about Haze (who claims he swore off all association with the gang in 2012) is probative evidence of the ongoing association-in-fact between the co-conspirators.

As another example, Perverso stated that law enforcement was investigating Peligroso [Canas] and Corrupto [Maltez] for an attack in Chelsea, and the gang believed that Smiley [Rivas] was cooperating with law enforcement in connection with that investigation.  *See* Oct. 24, 2018 Recording at pp. 16-17.  These statements are admissible

for the non-hearsay purpose of providing the motive for the murder regardless of the truth of the matter asserted. In other words, regardless of whether law enforcement was *in fact* investigating Peligroso for some attack, and regardless of whether Rivas was *in fact* cooperating with the police, the mere fact that co-conspirators believed that or were talking about that is probative on the questions of motive and intent.

As yet another example, consider the statements by Gutierrez regarding his conversations with Duggins about joining the Sykos clique. Among other things, Gutierrez claims that he told Duggins about the December 2016 murder near Logan Airport that Gutierrez committed while a member of different MS-13 clique. Duggins apparently offered to promote Gutierrez to the rank of "chequeo," but Gutierrez did not want full credit because he committed that murder while associated with another clique:

> PERVERSO: HAZE was getting out right about that time, dude, and VAGO and SHADOW. I met them and they asked me, what's up what did I think, dude? I told them I would think about it, and a few days later, dude, HAZE called me. "What's going on? What did you decide?" "Yes, dude." So I was with them a good while ago. Afterwards, I beat up a son of a bitch over by Pollo Campero, and I stabbed him two times, dog, and he said to me, "Dude, we're making you Chequeo. I've also heard some things about you," he said to me. "No," I said to him, "for me, those things don't count. That was with another clique." I told him like that. "Dog, over at the park at the airport, I killed that son of a bitch." And he tells me, "That was it, dog."

Oct. 24, 2018 Recording at p. 8. Again, putting aside the truth of the matter asserted and whether Gutierrez *in fact* committed this murder—and Gutierrez is not presently charged with this murder and the government need not establish the truth of that matter at trial— these statements are admissible for non-hearsay purposes. Regardless of whether Perverso *in fact* "killed that son of a bitch" or regardless of whether Haze was *in fact* going to make Perverso a chequeo in the gang, these statements are probative on questions such

as identification, the association in fact between the co-defendants; the intent and knowledge of the co-defendants; whether they had reason to believe that some member of MS-13 would commit a pattern of racketeering activity; etc.

Accordingly, many of the challenged statements are admissible for non-hearsay purposes even putting aside the truth of the matter asserted therein. As shown above, some of the statements may be admissible to show the association-in-fact between the defendants while others may be admissible to show motive or knowledge. Yet other statements may be admissible to show context,[2] or to show intent,[3] or to show the

---

[2]     Examples include the statements by CW-1, CW-13, and CW-17 themselves, which are admissible to show context for the statements made by the declarant MS-13 co-conspirators. Even some of the statements by declarant co-conspirators are admissible to show the context of other statements. *See, e.g., United States v. Walter,* 434 F.3d 30, 34 (1st Cir. 2006) ("In several cases, we have held that when statements are offered only to provide context and not for the truth of the matter asserted, those statements are not hearsay.") (citations omitted); *United States v. McDowell,* 918 F.2d 1004, 1007 (1st Cir. 1990) ("[A] defendant, having made admissions, [cannot] keep from the jury other segments of the discussion reasonably required to place those admissions into context.").

[3]     For example, when describing the Rivas murder, Perverso stated that the victim was screaming "PELI, PELI, PELI, PELI!" as Peligroso was "laughing his head off" and killing him, while Desalmado and Silencio were also "stabbing the knife right through him." Oct. 24, 2018 Recording at p. 22. Separately, Perverso described Peligroso hacking the victim "like he was chopping wood" and "dicing him as if he were a cow." *Id.* at 21.

        The government does not intend to offer the statement that Peligroso was "laughing his head off" for the truth of the matter asserted. Nor is it essential for admissibility whether the victim actually said PELI! PELI! PELI! PELI! as he begged for his life, or whether Peligroso was literally dicing the victim "as if he were a cow." However, these gleeful descriptions of the murder are relevant to whether Perverso and the other defendants murdered Rivas with "extreme atrocity and cruelty."

        The Superseding Indictment alleges in ¶ 13 that this murder was committed "with extreme atrocity and cruelty" in violation of M.G.L. c. 265, § 1. In analyzing whether a murder was committed with "extreme atrocity and cruelty," the relevant factors include "whether the defendant was indifferent to or took pleasure in the suffering of the deceased," "whether the defendant's method or means of killing the deceased were reasonably likely to substantially increase or prolong the conscious suffering of the victim," and "whether the means used by the defendant were excessive and out of proportion to what would be needed to kill a person." *Commonwealth v. Castillo*, -- Mass. --, 2020 WL 5903487, * 11 (Oct. 6, 2020).

declarant's state of mind,[4] or to show the investigative steps pursued by law enforcement,[5] or to show verbal acts,[6] or to show the impact on the listener,[7] or for some other non-hearsay purpose that the government or the court can reasonably discern.[8]

---

[4]     The declarant's state of mind is another issue that the defendants—not the government—appear intent on raising at trial, thus further providing non-hearsay relevance to the challenged statements.  Among other things, Gutierrez has filed a Rule 12.2 Notice and the Canas/Yanes Motion raises questions about Gutierrez's state of mind.  Gutierrez's description of events may be probative as to his mental ability and state of mind, regardless of the truth of the matter asserted in his statements.  For example, Gutierrez's description of events—which are corroborated by other evidence—show that these are not the insane ramblings of someone suffering from a serious mental disease or defect.  Similarly, statements indicating that Gutierrez tried to mislead authorities about the gang-relationship of his 503 tattoo, *see* Oct. 24, 2018 Recording at p. 2 ("They just say that 503 is gang related, and my lawyer was telling them, no, that it's the code when one calls El Salvador."), is relevant as to Pervero's state of mind, mental ability, etc.

[5]     For example, during the non-recorded portion of the conversation with CW-13, Perverso told CW-13 that the knives used in the murder were hidden in the basement of Peligroso's house.  Based on that information, law enforcement sought a warrant for the house associated with Peligroso, where law enforcement found hidden two large knives consistent with the murder weapons.  Perverso's statements about those knives are admissible to, among other things, provide context to the investigatory steps pursued by law enforcement in obtaining other evidence.  *See, e.g.*, *United States v. Jimenez*, 419 F.3d 34, 44 (1st Cir. 2005) ("The challenged statements were properly admissible, not for their truth, but to provide context to (1) [the declarant's admissions], and (2) the investigatory steps pursued by [law enforcement].").

[6]     For example, certain statements by Perverso, particularly when he described Peligroso, Desalmado, and himself stabbing and hacking the victim to death, are examples of verbal acts.  *See, e.g.*, Oct. 24, 2018 Recording at p. 22 (discussing Desalmado's stabs as "Bang, bang, bang, bang!"); *id.* at p. 9 (describing Haze's attacks on a disloyal member named Serio as "Boom, Boom, Boom.").

[7]     For example, the statements amongst the co-conspirators about Rivas working for the police are relevant to show their effect on the gang members, not necessarily for the truth of the matter asserted.  For example, Perverso recounts how the police in Chelsea wanted to recruit Rivas as an informant and the gang heard that Rivas apparently said, "Yes, I'm going to work for you."  Oct. 24, 2018 Recording at p. 17.  Regardless of whether Rivas *in fact* said that, those statements are relevant because they supply the motive for the subsequent murder and because of their effect on the co-defendants.  For example, Perverso almost immediately follows that up by saying that upon learning that information, "Peligroso, dude, was so furious he even turned red!  ... We wanted to dice him [Smiley], dude."  Oct. 24, 2018 Recording at p. 18.

[8]     This section discussed various non-hearsay theories of relevance that allow for the admission of the statements for non-hearsay purposes.  "It is a mistake, however, to think

## II.  **Co-Conspirator Statements Do Not Violate the Confrontation Clause and Duggins Invites Error From the Court in Seeking Such a Ruling.**

Turning next to the admissibility of the challenged statements under Fed. R. Crim. P. 801(d)(2)(E), but before discussing the applicability of Rule 801(d)(2)(E) to the Gutierrez statements, the government addresses the primary argument raised by Duggins: "The statements given by Salvador Gutierrez were 'testimonial' and are therefore barred by the Sixth Amendment to the United States Constitution."  Duggins Motion at p. 10.  In over a dozen pages of argument, *see id.* at 10-22, Duggins argues that by admitting the statements by Gutierrez as co-conspirator statements, the court would violate his rights under the Sixth Amendment's Confrontation Clause because co-conspirator statements of this type are testimonial.  Simply put, the argument by Duggins is wrong and invites the court to commit error.

In *Crawford v. Washington*, 541 U.S. 36 (2004), the Supreme Court generally held that out-of-court statements by witnesses *that are testimonial* are barred under the Confrontation Clause of the Sixth Amendment unless the witnesses are unavailable and the defendants had a prior opportunity to cross-examine witnesses.   The entirety of the Sixth Amendment challenge by Duggins seems to rise and fall on the applicability of

---

of these categories as having any independent doctrinal power."  Charles Alan Wright et al., *Federal Practice & Procedure*, § 6718 (2020 ed.) (hereinafter "*Wright & Miller*").

"The analysis is never whether the out-of-court statement can be labeled with a familiar, non-hearsay moniker, such as 'verbal act' or 'effect on the listener.'  ... Instead, the dispositive question is always whether the statement is being offered for the truth of the matter asserted by the out-of-court declarant.  As one court explains:

'So long as out-of-court statements are not offered for their truth, they are not hearsay, it is unnecessary to fit such statements into one particular category, like verbal act, although this is often done, primarily as a short-hand way of explaining the non-hearsay purpose for which the statement is offered.'"

*Wright & Miller*, § 6718 (quoting *United States v. Murphy*, 193 F.3d 1, 5-6 (1st Cir. 1999)).

*Crawford* and its progeny to co-conspirator statements, with Duggins arguing that this court should deem the Gutierrez statements to be "testimonial," and thus barred, regardless of whether they otherwise qualify as co-conspirator statements in furtherance of the conspiracy.  *See generally* Duggins Motion at pp. 10-22.  According to Duggins, "it matters not that [the Gutierrez] statements could also be considered 'non-testimonial' under some federal rule of evidence," *id.* at 22, because co-conspirator statements, especially to informants, are necessarily "testimonial."  There are a number of problems with this argument:

*First*, the arguments by Duggins appear to ignore the language of *Crawford* itself. At multiple points in his argument—*see* Duggins Motion at pp. 10, 12, 19, 20, 21—Duggins cites to Justice Scalia's opinion in *Crawford* as supporting the notion that a historical or originalist approach to the meaning of the Confrontation Clause shows that co-conspirator statements are testimonial and barred by the Sixth Amendment.  This court need not spend time engaging in a historical analysis of the Sixth Amendment—the Supreme Court already did that in *Crawford*, concluding that, "the 'right ... to be confronted with the witnesses against him,' U.S. Const. amend. VI, is most naturally read as a reference to the right of confrontation at common law, admitting only those exceptions established at the time of the founding."  *Crawford*, 541 U.S. at 54.  The problem for Duggins comes in what the Supreme Court stated next when citing examples of the exceptions that "had become well established by 1791."  *Id.* at 55.  "Most of the hearsay exceptions covered *statements that by their nature were not testimonial—for example*, business records or *statements in furtherance of a conspiracy*."  *Id.* at 56.  Thus, *Crawford* itself acknowledges that statements in furtherance of a conspiracy have been exceptions to hearsay since the ratification of the Sixth Amendment in 1791.

*Second*, the arguments by Duggins appear to ignore the reasoning of *pre-Crawford* Supreme Court cases—which remain good law—analyzing the applicability of the Confrontation Clause to co-conspirator statements. *See, e.g.*, *United States v. Inadi,* 475 U.S. 387, 391 (1986) (holding that the Confrontation Clause does not require a showing of unavailability as a condition to admission of the out-of-court statements of a non-testifying co-conspirator); *Bourjaily v. United States,* 483 U.S. 171, 183–84 (1987) (holding that the Confrontation Clause also "does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)."). The typical Confrontation Clause concerns simply do not apply to co-conspirator statements. As the Supreme Court stated in rejecting a Confrontation Clause challenge to a co-conspirator statement in *Inadi*:

> Because they are made while the conspiracy is in progress, *such [co-conspirator] statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court. ... Conspirators are likely to speak differently when talking to each other in furtherance of their illegal aims than when testifying on the witness stand.* Even when the declarant takes the stand, his in-court testimony seldom will reproduce a significant portion of the evidentiary value of his statements during the course of the conspiracy.

*Inadi*, 475 U.S. at 395 (emphasis added).[9] Accordingly, "The *admission of co-conspirators' declarations into evidence thus actually furthers the Confrontation Clause's very mission* which is to advance the accuracy of the truth-determining process in criminal trials." *Id.* at 396 (citations and quotations omitted) (emphasis added).

---

[9]     Gutierrez's chilling descriptions of the murder of Rivas, including his gleeful descriptions of how five of the defendants stabbed Rivas to death while the teenage boy was begging for his life, are excellent examples of this principle. It is difficult to imagine that trial witnesses, even witnesses who may have been at the murder scene themselves, will be able to replicate the tone, manner, and substance of Gutierrez's descriptions when he thought he was speaking in confidence to a fellow MS-13 member.

*Third*, the arguments by Duggins appear to ignore the reasoning of *post-Crawford* Supreme Court cases analyzing the applicability of the Confrontation Clause to co-conspirator statements.  For example, in *Davis v. Washington*, 547 U.S. 813, 825 (2006), the Supreme Court approvingly cited to *Bourjaily,* 483 U.S. at 171, in which it had previously analyzed co-conspirator statements made unwittingly to a Government informant.  Referencing the co-conspirator statements in *Bourjaily*, the Supreme Court noted that, "the statements at issue *were clearly nontestimonial.*"   547 U.S. at 825 (emphasis added).   The language in *Giles v. California*, 554 U.S. 353 (2008) is also instructive.  The Supreme Court again cited to the admission of co-conspirator statements in *Bourjaily* and noted that "it did not violate the Confrontation Clause for the quite different reason that *it was not (as an incriminating statement in furtherance of the conspiracy would probably never be) testimonial.*"  *Id.* at 374, n. 6 (emphasis added).

*Fourth*, given the Supreme Court jurisprudence summarized above, it is unsurprising that the First Circuit has held on multiple occasions, *even post-Crawford*, that co-conspirator statements are not testimonial.  *See, e.g.*, *United States v. Ciresi*, 697 F.3d 19, 31 (1st Cir. 2012) ("[W]e have already addressed this issue post-*Crawford* and concluded that coconspirator statements ... are, by their nature, not testimonial.").  *See also United States v. Rivera-Donate*, 682 F.3d 120 (1st Cir. 2012); *United States v. De La Paz–Rentas,* 613 F.3d 18, 28 (1st Cir. 2010); *United States v. Malpica–Garcia,* 489 F.3d 393, 397 (1st Cir. 2007); *United States v. Hansen*, 434 F.3d 92, 100 (1st Cir. 2006).  Duggins forcefully argues that this court should hold that the challenged co-conspirator statements are testimonial but fails to discuss all of this authority.  The finding that Duggins is seeking would run counter to well-established law.

*Fifth*, in addition to the First Circuit, *see Ciresi*, 697 F.3d at 31, there appears to be *unanimity* amongst the courts of appeal that *Crawford* does not apply to co-conspirator statements. *See, e.g., United States v. Farhane*, 634 F.3d 127, 162-63 (2d Cir. 2011); *United States v. Hendricks*, 395 F.3d 173, 183-84 (3d Cir. 2005); *United States v. Olguin*, 643 F.3d 384, 392 (5th Cir. 2011); *United States v. Martinez*, 430 F.3d 317, 328-29 (6th Cir. 2005); *United States v. Hargrove*, 508 F.3d 445, 448 (7th Cir. 2007); *United States v. Underwood*, 446 F.3d 1340, 1347-48 (11th Cir. 2006).

*Sixth*, and finally, the argument by Duggins that CW-13 was an informant when he spoke to Gutierrez, and that somehow changes the *Crawford* analysis, similarly misses the mark. As the First Circuit has repeatedly made clear when discussing co-conspirator statements post-*Crawford*, "It is immaterial that the person to whom the statement is made is a government informant...." *Ciresi*, 697 F.3d at 28. On this issue, too, the First Circuit's decisions are in line with other circuits. *See, e.g., United States v. Saget*, 377 F.3d 223 (2d Cir. 2004) ("[A] declarant's statements to a confidential informant, whose true status is unknown to the declarant, do not constitute testimony within the meaning of *Crawford*"); *United States v. Hendricks*, 395 F.3d 173, 184 (3d Cir. 2005) ("*Crawford* presents no bar to the admission of the statements of Defendants or their coconspirators made in the conversations with CI [] that he surreptitiously recorded.").

The Confrontation Clause analysis by Duggins is unsound and does not merit the exclusion of the challenged co-conspirator statements on Sixth Amendment grounds. Gutierrez is asking the court to ignore well-established law and fundamentally alter how co-conspirator statements are treated under federal law. The court should reject these arguments, decline to rule that the challenged statements are testimonial, and provisionally admit the statements subject to a final admissibility ruling at trial.

### III.   The Gutierrez Statements are Not Hearsay and are Admissible as Co-Conspirator Statements.

The government next turns to an analysis of the Gutierrez statements in particular. The statements are admissible against all defendants as non-hearsay.   They are admissible against Gutierrez under Fed. R. Evid. 801(d)(2)(A) as statements of an opposing party, and they are admissible against Gutierrez's co-conspirators under Fed. R. Evid. 801(d)(2)(E) as statements of a co-conspirator.[10]

#### A.   Legal Standard for Admissibility of Co-Conspirator Statements.

Rule 801(d)(2)(E) provides that statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay.   Such statements are admissible at trial for the truth of the matter asserted if the proponent establishes, *by a preponderance of the evidence*, that (1) a conspiracy existed, (2) the defendants were members of the conspiracy, (3) the declarants were also members of the conspiracy, and (4) the declarants' statements were made in furtherance of the conspiracy.   *United States v. Diaz*, 670 F.3d 332, 348 (1st Cir. 2012).

A district court's finding of admissibility under Rule 801(d)(2)(E) is known in this circuit as a *Petrozziello* ruling.   *See Ciresi*, 697 F.3d at 25 (citing *United States v. Petrozziello*, 548 F.2d 20 (1st Cir. 1977)).   "[A] district court is not required to make a *Petrozziello* ruling prior to admitting a statement under Rule 801(d)(2)(E). Instead, the court may admit the statement provisionally when it is introduced, deferring a final decision until the close of evidence." *Id.* "How this works is that a judge conditionally

---

[10]      Only the latter issue—the analysis under Rule 801(d)(2)(E)—is addressed in this memorandum.   If Gutierrez files a motion in the future arguing that the October 2018 statements are not statements of an opposing party or statements against penal interest, the government will address such arguments at that time.

admits the alleged coconspirator statements, 'subject to a later finding by the [judge], supported by extrinsic evidence (other than the statements themselves),' sufficient to show the conspiracy and the speaker's involvement in it." *United States v. George*, 761 F.3d 42, 54-55 (1st Cir. 2014) (quoting *United States v. Sepulveda-Hernandez*, 752 F.3d 22, 30 n.2 (1st Cir. 2014)).

In determining the admissibility of co-conspirator statements, the court may consider any relevant information, including the statements being offered for admission. *Bourjaily*, 483 U.S. at 181; *United States v. Rivera-Santiago*, 872 F.2d 1073, 1092-93 (1st Cir. 1989) (same); *United States v. Drougas*, 748 F.2d 8, 29 (1st Cir. 1984) ("[T]his court has previously stated that hearsay and other inadmissible evidence, including perhaps the very statement seeking admission, can be considered by the district court in ruling on the admissibility of coconspirators' statements.") (citation and quotation omitted).

Additionally, to be admissible, co-conspirator statements must have been made "in furtherance of" a conspiracy.  To be deemed "in furtherance," a statement "need not be necessary or even important to the conspiracy, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy in some way." *United States v. Martinez-Medina*, 279 F.3d 105, 117 (1st Cir. 2002).  *See also United States v. Rodriguez*, 525 F.3d 85, 101 (1st Cir. 2008) ("A statement is in furtherance of the conspiracy if it tends to advance the objects of the conspiracy as opposed to thwarting its purpose."); *United States v. Aviles-Colon*, 536 F.3d 1, 17 (1st Cir. 2008) (finding statements designed "to keep [co-conspirator] abreast of the conspiracy's activities" to be in furtherance of the conspiracy); *United States v. Siegelman*, 640 F.3d 1159, 1181 (11th Cir. 2011) ("[S]tatements between conspirators which provide reassurance [or] serve to maintain trust and cohesiveness among them . . . further the ends of the conspiracy[.]").

Importantly, "It is immaterial that the person to whom the statement is made is a government informant . . . as long as the statement itself was made in furtherance of the common scheme." *Ciresi*, 697 F.3d at 28.  *See also United States v. Leoner Aguirre*, 939 F.3d 310, 320 (1st Cir. 2019) (finding no error in the admissibility of statements made to a government informant in a related MS-13 case); *United States v. Piper*, 298 F.3d 47, 52-53 (1st Cir. 2002) (stating that when evaluating the admissibility of co-conspirator statements, it does not matter "whether the third party is a tipster, an informant, an undercover officer, or a mere acquaintance").[11]

### B. <u>The Gutierrez Statements Were in Furtherance of the Conspiracy.</u>

The government does not read the Duggins Motion or the Canas/Yanes Motion to seriously challenge the first three requirements for the admissibility of co-conspirator statements: (1) a conspiracy existed, (2) the defendants were members of the conspiracy, and (3) the declarant was a member of the conspiracy.  *Diaz*, 670 F.3d at 348.  To the extent needed, the government can make an offer of proof as to those factors, and the court already has enough before it to find, at least by a preponderance of the evidence, that (1) a conspiracy existed amongst members and associates of MS-13, (2) defendants Duggins, Canas, and Yanes were members of MS-13, and (3) declarant Gutierrez was also a member of MS-13.  *See, e.g.*, Dkt. No. 11 (Detention Affidavit); Dkt. No. 141 (Sealed Opp.

---

[11]    The *Leoner Aguirre* case was part of the prior series of MS-13 prosecutions in this District.  The discovery from that case has been turned over to the defendants in this case because some of the evidence from that case is likely to be admitted in this case as well.  Notably, for present purposes, Duggins complains about co-conspirator statements made to CW-1 by Lopez and others.  *See* Duggins Motion at pp. 30-37.  CW-1 is the *same CW* who made the recordings referenced in the *Leoner Aguirre* case.  Dozens of recordings made by CW-1 have been admitted in multiple prior MS-13 trials in this District.  To the extent that the First Circuit has opined on those rulings so far, the First Circuit has affirmed those rulings.  *See Leoner Aguirre*, 939 F.3d at 320.

to Prior Duggins Motions, which summarizes other evidence, including cooperating witness statements).   Further, in determining the admissibility of co-conspirator statements, the court may consider any relevant information, including the statements being offered for admission, *see Bourjaily*, 483 U.S. at 181, and here, the Gutierrez recording itself helps show the existence of the conspiracy and the membership of the defendants in the conspiracy.  *See generally* Oct. 24, 2018 Recording.

Turning then to the fourth factor—whether the statements were made in furtherance of the conspiracy—a variety of factors support a finding (or would support a finding as part of the court's *Petrozziello* ruling at trial) that the Gutierrez statements were made in furtherance of the conspiracy.  In conducting this analysis, the court should be mindful of a few bedrock principles: there is "no precise formula" to determine whether a statement is in furtherance, and a statement is "in furtherance of the conspiracy as long as it tends to promote one or more of the objects of the conspiracy." *Piper*, 298 F.3d at 54.  Further, "a statement *need not be necessary or even important to the conspiracy*, or even made to a co-conspirator, as long as it can be said to advance the goals of the conspiracy *in some way*."  *Martinez-Medina*, 279 F.3d at 117 (emphasis added).  "In other words, *the connection need not be inexorable*."  *Piper*, 298 F.3d at 54 (emphasis added).

In no particular order of importance, and without ascribing particular value to how these arguments are delineated, the government asks the court to consider the following arguments—amongst any others that may be apparent to the court upon its own review of the draft transcripts—that bear on the question of whether the Gutierrez statements qualify as co-conspirator statements:

*First*, the context in which Gutierrez met CW-13 and made multiple incriminating statements to CW-13 is itself compelling evidence that Gutierrez made the statements as

part of efforts to further the MS-13 racketeering conspiracy, and specifically, as part of efforts to promote trust and cohesion with a fellow MS-13 member.  Attached to the Duggins Motion is a proffer report of CW-13 that outlines how CW-13 first met Gutierrez in custody.  Duggins makes much of this proffer report in his Motion, but fails to recognize the true import of the circumstances in which Gutierrez spoke to CW-13—which is that the context and circumstances of the conversation alone show that Gutierrez intended to further, not frustrate, the MS-13 conspiracy.  *See United States v. LiCausi*, 167 F.3d 36, 50 (1st Cir. 1999) (citation and quotation marks omitted) ("The statement is admissible if it tends to advance the objects of the conspiracy as opposed to thwarting its purpose.").

Approximately a week before the October 24, 2018 jailhouse recording, CW-13 met with federal prosecutors and investigators to describe his initial interactions with CW-13.[12]  At that meeting, CW-13 described how *Gutierrez sought out CW-13 in jail*, Gutierrez told CW-13 that *another MS-13 member had been saying that CW-13 had cooperated with law enforcement* [which was incidentally true, and which is normally enough to get MS-13 members marked for death].  *See* Report of Oct. 16, 2018 Proffer.  To protect himself, CW-13 challenged Gutierrez for proof of this allegation, demanding to know if Gutierrez had seen any "paperwork" proving that CW-13 was a cooperator.  *Id.*[13]

---

[12]     These initial interactions between Gutierrez and CW-13 were *not* at the behest of law enforcement.  *See* Duggins Ex. 3 (Report of Oct. 16, 2018 Proffer), Canas/Yanes Ex. 12 (Discovery Letter Providing Background Regarding CW-13).  Before the prosecution team even realized that Gutierrez and CW-13 had met in jail, counsel for CW-13 reached out to the U.S. Attorney's Office to inform the government that CW-13 had heard about two murders from another prisoner in jail.  *See id.*

[13]     This is just one of many examples showing how critical witness safety is in this case, and why materials regarding cooperating witnesses need to be protected and not given in hand to the defendants.  Any documentary "proof" of a witness's cooperation may put his or her life at grave risk from a gang whose core principles include trying to murder those suspected of cooperating with law enforcement.  CW-13 and his family are now in the Federal Witness Security Program under the protection of the U.S. Marshals.

Ultimately, it appears that Gutierrez backed down from his allegation that CW-13 was a cooperator and started to get more comfortable with CW-13, leading to Gutierrez making multiple incriminating statements to CW-13 that CW-13 then offered up to law enforcement. *See id.* Given the significance of Gutierrez's statements, law enforcement asked CW-13 if he could try to get Gutierrez to discuss any of these topics on tape, which led to the October 24, 2018 recording approximately a week later.

When viewed through that prism and with that context in mind, Gutierrez's statements to CW-13 were "in furtherance" of the racketeering conspiracy.  "Statements between conspirators which provide reassurance or serve to maintain trust and cohesiveness among them … further the ends of the conspiracy." *Siegelman*, 640 F.3d at 1181 (punctuation marks and citations omitted); *Ciresi*, 697 F.3d at 29-30 (citing *Siegelman* for same proposition). [14] Here, Gutierrez had recently accused CW-13 of being an informant, which is a matter of life-and-death in the MS-13 gang.  CW-13 had challenged him on that assertion.  In the days ahead, as Gutierrez apparently started to get comfortable with CW-13, and as part of their increasing trust and comfort, Gutierrez began to share with CW-13 various details about the MS-13 enterprise and its activities.  That alone shows the value of the statements.  *See Ciresi*, 697 F.3d at 29 ("These statements plainly were in furtherance of the ongoing conspiracy. They were intended to

---

[14]     "Statement #1" highlighted by Duggins, *see* Duggins Motion at pp. 6-7, is an example of a statement that may fall into this informal category (in addition to other categories discussed below).  Gutierrez asks CW-13 about his history and background within the gang, and shares his own history and background, with the two discussing how they joined the gang when they were 16-17 years of age.  It is reasonable to infer that Gutierrez asking and answering questions about how he joined MS-13 as a teenager, and then sharing other details about his past, may have helped provide reassurance to CW-13, gained or maintained CW-13's trust, and/or helped Gutierrez and CW-13 relate to each other, especially given how their relationship started.

reassure [third-party] that [declarant] was dealing squarely with him...").  Put differently, what better way to "provide reassurance or serve to maintain trust and cohesiveness among them," *see id.*, than for Gutierrez to trust CW-13 with details about violent acts that Gutierrez and his clique members had committed.

*Second*, the statements by Gutierrez about the Rivas murder were also in furtherance of the MS-13 racketeering conspiracy because they helped signal to CW-13— *who Gutierrez had suspected of being a cooperator, see supra*—of what happens to those who cooperate with law enforcement.  "...Rule 801(d)(2)(e)'s 'in furtherance' requirement may be satisfied by statements that reasonably can be construed as imposing discipline upon wayward co-conspirators.*"  Piper*, 298 F.3d at 56 (citing *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1991)).  "[T]hat holding results, in material part, on a finding that the statements were intended to warn other members of the conspiracy of the ultimate consequences of falling out of line."  *Piper*, 298 F.3d at 56; *see also United States v. Perez-Cubertier,* 958 F.3d 81, 89 (1st Cir. 2020) ("Testimony about murder order or execution could reasonably be viewed as offering direct proof of the means used to carry out the conspiracy' and illustrating the conspiracy's internal systems of discipline.") (citation and quotations omitted).[15]  Here, it is reasonable to infer that when an MS-13 member discusses with another the need for loyalty and what happens to those who cooperate against MS-13, such discussions further the conspiracy by illustrating the

---

[15]     "Statement #3" highlighted by Duggins, *see* Duggins Motion at p. 8, is an example of a statement that may fall into this informal category of co-conspirator statements (amongst others).  Perverso flat out stated that he and others killed the boy at the park in Lynn "because the guy was working with the cops."  *See* Oct. 24, 2018 Recording at p. 16. The draft transcript indicates that he then made a reference to Duggins, who he had separately stated just a few minutes ago was the current "First Word" of the clique, *see* Oct. 24, 2018 Recording at p. 14, and who was still out on the street at this time.

gang's internal system of discipline and highlighting the consequences of falling out of line.  This is especially true when a co-conspirator like Gutierrez is describing in chilling and horrific detail how a suspected cooperator was stabbed and hacked to death by members of MS-13.

*Third*, both the Duggins Motion and the Canas/Yanes Motion go to great lengths to try to narrow the scope of the charged MS-13 racketeering conspiracy, arguing in various ways that historical descriptions of murder or violent acts could not be in furtherance of the conspiracy.  This argument, too, misses the mark.  *See, e.g.*, *United States v. Newton*, 326 F.3d 253, 259-60 (1st Cir. 2003) ("The defendant argues that an after-the-fact description of the [ ] murders could not have furthered the objective of eliminating individuals who by that time were already dead. Once again, this argument construes the relevant 'objective' of the conspiracy too narrowly. The *Petrozziello* requirements are satisfied so long as [declarant's] act of communicating the motivation behind the murders and the manner in which they were committed furthered the broad objectives of the [ ] conspiracy.").  As the First Circuit said in affirming the admission of the statements in *Newton*, "The trial court could reasonably have determined that this conversation served the important function of reassuring [the listener] that [declarant's] organization was effectively addressing external threats to its security and profitability." *Id.*  Put differently, the discussion by Gutierrez of the murder(s) served multiple purposes: to the extent that CW-13 may have been inclined to cooperate with law enforcement and be disloyal to the gang, it signaled to CW-13 what MS-13 does to cooperators.  To the extent that CW-13 was not inclined to cooperate with law enforcement and was a loyal member of the gang serving out his sentence, it signaled to CW-13 that MS-13 was continuing to effectively address external threats on the outside (as Gutierrez further

relayed with his discussion of how Gutierrez and other MS-13 members murdered a suspected gang rival in December 2016).

*Fourth*, "the statements revealed acts and transactions which were part of the conspiracy and which occurred independently of any inducement by the co-conspirator turned agent. Whether they furthered the conspiracy, it should be noted that once the conspiracy is established, statements by co-conspirators which do not actually achieve some of the conspiracy's goals but which reveal an intention to promote its objectives have been admitted as being 'in furtherance of' the conspiracy, within the meaning of the hearsay exception." *United States v. Crocker*, 788 F.2d 802, 805 (1st Cir. 1986) (citing *United States v. Guerro*, 693 F.2d 10, 13 (1st Cir. 1982). Gutierrez's statements revealed multiple acts and transactions that were part of the MS-13 conspiracy, all of this occurred independent of any inducement by CW-13, and these same acts and transactions further demonstrated an ongoing intention to promote the objectives of MS-13.

*Fifth,* courts have repeatedly held that the reporting of significant events by one co-conspirator to another advances the conspiracy.[16]   *See, e.g.*, *United States v. Sepulveda*, 15 F.3d 1161 (1st Cir. 1993) ("We think it is common ground—and common sense—that the reporting of significant events by one coconspirator to another advances the conspiracy.") (citing *United States v. Smith*, 833 F.2d 213, 219 (10th Cir. 1987)). Faced with this line of cases, the defendants go to great lengths to try arguing that Gutierrez was not reporting on "significant events" in the conspiracy.   *See, e.g.*, Canas/Yanes Motion at pp. 13-19.  This argument does not pass muster.  Gutierrez was reporting on the activities of the MS-13 enterprise and its members, *including the recent*

---

[16]     The statements by Gutierrez about the Rivas murder can be considered as being "in furtherance of" the conspiracy on this basis alone.

*murder of a suspected cooperator* and the prior *murder of a suspected gang rival.* These statements, on their face, constitute "the reporting of significant events" by a co-conspirator. *See id.*; *see also United States v. Rivera-Donate*, 682 F.3d 120, 132 (1st Cir. 2012) ("At the very least, the district court could reasonably have determined that the conversation between [the defendant, a cooperating witness, and an unindicted co-conspirator] about the murder of Torres served to keep the members of the conspiracy up-to-date on important developments relating to the organization."). There will be plenty of evidence at trial that the core operating principles of MS-13 include the need to attack rivals and those suspected of cooperating with law enforcement. *See also* Superseding Indictment, ¶ 12. It strains credibility to argue that the *murder of a suspected rival* and the *murder of a suspected cooperator* are not significant events relating to the MS-13 enterprise.

*Sixth*, "statements of a conspirator identifying a fellow co-conspirator have also been considered as made in furtherance of the conspiracy." *Crocker*, 788 F.2d 805 (citing *United States v. Handy*, 668 F.2d 407, 408 (8th Cir. 1982)); *see also United States v. Munson*, 819 F.2d 337, 341 (1st Cir. 1987) ("The statement was in furtherance of the conspiracy because it identified a fellow conspirator...") (citations omitted). This reasoning provides yet another basis to treat the statements by Gutierrez identifying and describing the roles of Duggins, Yanes, and Canas as statements in furtherance of the conspiracy. "These recorded statements were more than idle chatter. These conversations *identified the participants in the conspiracy and revealed their disposition and availability to continue with the [unlawful] activity*. In fact, they were so revealing of the conspiracy's development and the conspirators' participation that one of them

resulted in the arrest of defendant and co-conspirator...."  *Crocker*, 788 F.2d at 805 (emphasis added).[17]

*Seventh*, and relatedly, it is worth remembering that at the time that Gutierrez made his statements to CW-13 in October 2018, none of the defendants had been charged in federal court with racketeering, none of the defendants had been charged in state court with murder, there is no evidence that Gutierrez even knew that his co-conspirators were targets of a federal investigation, and *at least two of the defendants (including Duggins) were out on the street*.  Gutierrez was thus describing not just historical facts, but identifying present-day members of the conspiracy who had an "ongoing disposition and availability to continue" the gang's activities.[18]

*Eighth*, "the sharing of pertinent information about a conspiracy's mode of operation furthers the conspiratorial ends."  *Munson*, 819 F.2d at 337;  *see also Sepulveda*, 15 F.3d at 1180 (citing *Munson* for same proposition and concluding that statement concerning unlawful activity, in that case drug sales, "furthered the conspiracy by informing other co-conspirators of another person's role and activities").  Here, the statements by Gutierrez plainly informed CW-13 about the conspiracy's mode of operations, the roles and activities of co-conspirators, etc., and they thus furthered, not

---

[17]    "Statement #2" highlighted by Duggins, *see* Duggins Motion at p. 7, is an example of a statement that may fall into this informal category of co-conspirator statements (amongst others).  Gutierrez identified participants (including leaders) in the conspiracy and discussed their disposition and availability to continue with unlawful activity.

[18]    "Statement #2" highlighted by Duggins on page 7 of his Motion also falls into this informal category of co-conspirator statements.  Contrary to Duggins's arguments, Gutierrez stating who *currently* has the First Word in the clique adds, not detracts, from the argument that these are co-conspirator statements.  Gutierrez is not only identifying relevant historical facts, but he is identifying the current leadership structure of the clique, thus further identifying those who may be available on the outside to continue the gang's activities.

frustrated, the conspiracy.[19]  *See id.*; *see also Martinez-Medina*, 279 F.3d at 117 ("Six of the statements challenged by the appellants *easily satisfy this requirement because they conveyed to other co-conspirators information about the operations of the ... conspiracy.*") (emphasis added); *United States v. Cruz-Ramirez*, 782 Fed. Appx. 531, 540 (9th Cir. 2019) (affirming conviction of MS-13 members for RICO violations and holding that the district court properly admitted a co-conspirator's jailhouse statements  because the statements kept co-conspirators abreast of an ongoing conspiracy's activities); *United States v. Ayala*, 601 F.3d 256, 268-69 (4th Cir. 2010) (affirming conviction of MS-13 members for RICO violations and holding that the district court properly admitted a co-conspirator's statements to an informant).

     *Ninth*, Gutierrez's statements were also in furtherance of the conspiracy because his various admissions to murder and his long-standing participation in MS-13's activities bolstered his own standing and his clique's standing to CW-13 (who belonged to another clique).  *See, e.g.*, *United States v. Ponzo*, 853 F.3d 558, 580 (1st Cir. 2017) ("Rudolph's statements *satisfy the 'in furtherance' requirement because they* showed Ponzo's role in the conspiracy or *alternatively bolstered his standing within the organization* since they characterized him as an experienced marijuana packer.") (citation omitted) (emphasis added).  Given how central violence is to the MS-13 enterprise, an MS-13 member telling another member about violence that he and his clique members personally committed,

---

[19]    "Statement #5" highlighted by Duggins on pages 8-9 of his Motion fall into this informal category of co-conspirator statements (among other categories discussed herein).  Gutierrez [Perverso] discusses not only the gang's activities and mode of operations, but he further discusses how Duggins [Haze] advised Perverso to conduct operations and avoid detection, specifically, how Duggins advised Gutierrez not to commit murder with Lopez [Mayimbu] because Lopez has a big mouth.

and murders that they committed in particular, greatly boosts his own reputation and the reputation of his clique within the gang.

As shown above, for purposes of admissibility as co-conspirator statements under Rule 801(d)(2)(E), the court can reasonably conclude for a number of different reasons—especially under a preponderance standard—that the Gutierrez statements were made "in furtherance of" the conspiracy.

### C. <u>The Arguments About the "Inherently Unreliability" of the Gutierrez Statements are Without Merit.</u>

The government next responds to the argument that the Gutierrez statements are so inherently unreliable that their relevance is substantially outweighed by the danger of unfair prejudice.  *See* Canas/Yanes Motion at pp. 19-25.  This argument is premised, nearly in its entirety, on statements by Canas and Yanes about Gutierrez's mental state and ability.  This argument must be rejected for a number of reasons:

*First*, there is no admissible evidence that Gutierrez has mental health issues that affect his *memory or perception* of past events.   At best, Canas and Yanes can point to a 2016 competency evaluation of Gutierrez (the "Sanford Report").  *See* Canas/Yanes Ex. 2. However, the Sanford Report was prepared years ago for a different purpose, and competency to stand trial in that 2016 state court proceeding presents an entirely different set of questions than whether Gutierrez has any mental disease or defect that may impact the present proceeding, or whether he had any memory problems in 2018.

*Second*, as the government has already informed the court and counsel, the government intends to move to strike the Gutierrez Rule 12.2 Notice and the Sanford Report, and any related testimony on this issue is highly unlikely to be admissible.  *See* Dkt. No. 285 (Govt. Response to Court Order regarding Rule 12.2 Notice and Related

Issues); Transcript of August 17, 2020 Hearing at p. 54 (THE COURT:  "It's not clear to me what the relevance of Dr. Sanford's report is...").  The government, at the request of Gutierrez, has held off on filing its motion to strike the Sanford Report because it is still awaiting expert disclosures that Gutierrez claims he will be submitting to the government. For present purposes, the government's response to that Rule 12.2 Notice, *see* Dkt. No. 285, summarizes the significant infirmities with that notice and the proposed testimony.

*Third*, the court gave every defendant, *including Canas and Yanes*, an opportunity to opine on whether Gutierrez should be evaluated for any mental health issues, and *no defendant, including Canas or Yanes*, demanded that Gutierrez be evaluated.  *See* Dkt. No. 273 (July 28, 2020 Order instructing "each of the defendants" to report on their views as to whether the court should order an examination of Gutierrez's mental condition for purposes of Rule 12.2(b), Rule 12.2(c), or order an examination of "mental condition *for any other reason* and, if so, the questions it should address and the procedures that should be employed.") (emphasis added); Dkt. No. 287 (Yanes Response to Court Order) ("Mr. Salvador Gutierrez's attorney is in the best position to assess whether such an evaluation is necessary.").  *See also generally* Transcript of August 17, 2020 Hearing (Gutierrez's attorney taking the position that no evaluation was necessary and counsel for the other defendants not demanding one either).  The defendants should not be allowed to rely on some 2016 evaluation that was prepared for an entirely unrelated purpose to make self-serving claims about the reliability of Gutierrez's memory in 2018.

*Fourth*, and perhaps most importantly, the Canas/Yanes arguments about the reliability of the Gutierrez statements are without factual support.  The reason that the co-defendants are so desperate to have the Gutierrez statements excluded is that the statements are devastating corroboration of what the other evidence in the case already

shows.  It is striking and conspicuous that in a murder case where one of the murderers makes pages upon pages of damning admissions and incriminating statements about the who, what, when, where, and why of the murder, *the co-defendants have pointed out little that Gutierrez actually got wrong about the murder.* Put differently, can there be any doubt that if the Gutierrez descriptions of the murder were factually inconsistent in any meaningful way with the other evidence in the case, the defendants would have forcefully pointed that out?  The mere fact that the entire section in the Canas/Yanes Motion about the unreliability of the Gutierrez statements does not contain a detailed discussion of how the Gutierrez statements are inconsistent with other evidence is an implicit admission about the overall reliability of the Gutierrez statements.[20]

The government submits that no more is needed at this stage, but as an offer of proof, the government states, as the defendants well know, that two of the participants in the murder corroborate Gutierrez's statements about the murder and vice versa.[21]

---

[20]     The only thing the defendants even attempt to nit-pick is Gutierrez's statement that clique members had seen messages on Rivas's phone suggesting he was cooperating with law enforcement.  Rivas was not.  That does not show some "inherently unreliability" of the pages upon pages of statements by Gutierrez about the murder or show that he was deliberately lying.

[21]     Canas and Yanes know more than just the mere fact that the government has cooperating witnesses.  The defendants have a summary of *what those witnesses will say* and the defendants know full well that the government's witnesses inculpate Canas and Yanes in the murder of Rivas.  The government began producing early Jencks material a year ago, including cooperator statements that corroborate the Gutierrez statements and point to Canas and Yanes as being two of the defendants who stabbed Rivas to death.

### D.  __Responses to Other Miscellaneous Defense Arguments.__

To the extent not already addressed by the arguments above, the government responds to a few other points raised by the defendants in their filings:

*First*, the government again highlights for the defendants and the court that the conspiracy charged and the enterprise alleged relates to the transnational criminal organization known as MS-13, not the local Sykos clique.  *See* Dkt. No. 83 (Superseding Indictment); *cf.* Canas/Yanes Motion at Section I.B ("The Statement Did Not Further any Goals of the Alleged Sykos Clique Conspiracy").  It is unclear why the defendants continue to refer to some uncharged "Sykos clique conspiracy" in various filings.  The continued efforts by the defendants to improperly narrow the scope of the conspiracy are without merit and a red herring.  As shown above, the statements by Gutierrez were relevant to, and in furtherance of, the broader MS-13 conspiracy.

*Second*, the arguments that Gutierrez made the statements to increase his own status in jail are self-defeating.  *See* Canas/Yanes Motion at p. 11 (arguing that Gutierrez's "intention in making these statements was to create the impression that he was a violent thug, with violent friends, who was not to be messed with. The creation of a violent reputation was necessary to protect himself against possible threats in jail.").  The theory espoused by the defendants may itself be sufficient to show the "in furtherance" nature of the statements.  An MS-13 member trying to send a message that "he was a violent thug, with violent friends, who was not to be messed with" itself furthers the conspiracy by helping to protect and further the status of Gutierrez and his co-conspirators.

*Third*, the Canas/Yanes Motion places incorrect importance on the question of whether Gutierrez and CW-13 need to be co-conspirators.  *See* Canas/Yanes Motion at p. 14 ("For this rule to apply, the government must prove by a preponderance of the evidence

that CW-13 and Salvador-Gutierrez were coconspirators."). That is not true. *See, e.g.*, *Ciresi*, 697 F.3d at 28 ("It is immaterial that the person to whom the statement is made is a government informant ..."); *Leoner Aguirre*, 939 F.3d at 310 (finding no error in the admissibility of statements made to a government informant in a related MS-13 case); *Piper*, 298 F.3d at 52-53 (holding that it does not matter "whether the third party is a tipster, an informant, an undercover officer, or a mere acquaintance"). In any event, what is perhaps most important is that Gutierrez *thought* he was sharing notable developments with a fellow MS-13 member. That is the critical factor in the analysis. Whether CW-13 was *actually* a loyal MS-13 member as opposed to an informant is immaterial.

*Fourth*, given the evidence in this case, it also strains credibility for defendants to argue that "the scheme to murder Herson Rivas was neither necessary or advantageous to the success of any aspect of MS-13's plans or goals to which CW-13 was a party." Canas/Yanes Motion at p. 18. CW-13's membership does not matter for reasons stated above. In any event, CW-13 pleaded guilty to RICO conspiracy on behalf of MS-13, with the alleged pattern of racketeering activity including acts involving murder, the same offense that the defendants are charged with, and the cases had the same allegations regarding the purposes and objectives of MS-13. Defendants cannot seriously argue that the scheme to murder a suspected cooperator was "neither necessary or advantageous to the success of any aspect of MS-13's plans or goals."

*Fifth*, the argument that "the Sykos clique in Boston was notoriously independent from other MS-13 cliques and the broader MS-13 gang" is also without merit. As a legal matter, this supposed distinction does not matter, but in any event, as a factual matter, the government notes that in the Gutierrez recording, Gutierrez described his personal participation in the December 2016 murder and stated that he committed that murder

*while he was a member of the TLS clique of MS-13.  See* Oct. 24, 2018 Recording at p. 8. Further, Gutierrez stated that he committed the 2016 murder *with the assistance of members of the Huntington clique* of MS-13.  *See* Oct. 24, 2018 Recording at pp. 11-12.

*Sixth*, the defendants cannot seriously argue that "Gutierrez's statements are not admissible as statements against penal interest."  Canas/Yanes Motion at pp. 25-27. Gutierrez made multiple statements *admitting to murder*.  It is hard to imagine a category of statements more against a declarant's penal interest.

None of the arguments regarding exclusion of the Gutierrez statements survive scrutiny and both the Duggins Motion and the Canas/Yanes Motion should be denied, subject to the defendants retaining their rights to renew their objections at trial under the *Petrozziello* framework.

## IV.   The Other Statements Challenged by Duggins Should be Admitted.

For the reasons above, and in particular, because the challenged statements have non-hearsay purposes (*see supra* Section I) and because they are otherwise statements in furtherance of the conspiracy (*see supra* Section III), the other statements challenged by Duggins should also be admitted.  *See* Duggins Motion at pp. 30-37 (challenging portions of the April 28, 2015 Recording and the Dec. 29, 2017 Recording).

*First*, as to the statements on p. 4 of the April 18, 2015 Recording, *see* Duggins Motion at p. 31, many of the arguments above apply with equal force and show the "in furtherance" nature of the statements.  Among other things, "these conversations identified the participants in the conspiracy and revealed their disposition and availability to continue with the [unlawful] activity."  *Crooker*, 788 F.2d at 805.  To the extent that Duggins raises an additional argument here that the government cannot show the "Delincuente" was a co-conspirator, that argument goes nowhere.  The government can

show that Delincuente is a co-conspirator even if limiting itself just to the draft transcripts attached by Duggins. *See* Oct. 24, 2018 Recording at p. 9 (Perverso discussing how Delincuente was running the Sykos clique when Haze [Duggins] was locked up); *id.* at p. 14 (Perverso stating that Delincuente made Mayimbu [Lopez] the Second Word). *See also* April 18, 2015 Recording at pp. 14-15 (containing other references to Delincuente).

*Second*, as to the statements on pp. 12-14 of the April 18, 2015 Recording, *see* Duggins Motion at p. 31-33, these statements are in furtherance, among other reasons, because they again reflected the identification of co-conspirators and discussed the disposition and availability of co-conspirators to continue with the conspiracy.   In discussing the ongoing activities of the clique and how things were about to take a turn for the better because Haze [Duggins] was about to get out of prison, Mayimbu [Lopez] stated, "those dogs are about to get out, dude.  You'll see then, dude." April 18, 2015 Recording at p. 12.   The surrounding pages contain further statements about the operations of the gang; the relative roles played by various co-conspirators; the respect on the street that the gang has, should have, or will have; the significant respect that Duggins deserved for how he operated; etc.  *See id.* at pp. 13-15.  In addition to the reasons above, these statements also served to "keep the members of the conspiracy up-to-date on important developments relating to the organization," *Rivera-Donate*, 682 F.3d at 132, "conveyed to other co-conspirators information about the operations of the ... conspiracy," *Martinez-Medina*, 279 F.3d at 117, "bolstered [a co-conspirator's] standing within the organization," *Ponzo*, 853 F.3d at 580, and "furthered the conspiracy by informing other co-conspirators of another person's role and activities," *Sepulveda*, 15 F.3d at 1180.  The challenged statements on the April 18, 2015 Recording made by CW-1 are admissible as co-conspirator statements in furtherance of the conspiracy.

*Third*, as to the statements on the Dec. 29, 2017 Recording, *see* Duggins Motion at pp. 34-37, the primary argument advanced by Duggins appears to be that "Mayimbu is telling gang business to at least one outsider—CW-17."  Duggins Motion at p. 35; *see id.* at 35-37 (raising that same objection three separate times).  As stated above, *see supra* at p. 16, this argument does not carry the day and it does not matter whether CW-17 was a co-conspirator, informant, or mere acquaintance.  *See, e.g.*, *Piper*, 298 F.3d at 52-53 (stating that when evaluating the admissibility of co-conspirator statements, it does not matter "whether the third party is a tipster, an informant, an undercover officer, or a mere acquaintance").

*Fourth*, as to the only other argument raised about the Dec. 29, 2017 Recording—that in a section discussing the "East Sides," "Mayimbu is talking about how some other gang (or clique) wanted Duggins to join, *see* Duggins Motion at p. 36—that argument is specious.  Duggins knows full-well based on multiple pretrial disclosures that the charged racketeering conspiracy involves MS-13, not individual cliques, and further, that the "East Sides" are another significant MS-13 clique operating in Massachusetts.

Similar to the arguments regarding the exclusion of the Gutierrez statements to CW-13, none of the arguments regarding the exclusion of the co-conspirator statements to CW-1 and CW-17 survive scrutiny.  The Duggins Motion should also be denied as to these points, subject to Duggins retaining his right to renew his objections at trial under the *Petrozziello* framework.

## CONCLUSION

For all of the foregoing reasons, the government requests that the Duggins Motion (Dkt. No. 334) and the Canas/Yanes Motion (Dkt. No. 357) be **DENIED,** at least at this stage, subject to renewal at trial as part of the court's *Petrozziello* ruling.  The court should rule that the challenged statements are provisionally admissible as substantive evidence at trial pursuant to Federal Rule of Evidence 801(d)(2)(E), subject to the court's final *Petrozziello* ruling at the close of evidence.  To the extent necessary, the government requests that it be allowed to supplement its arguments on these issues before final admissibility, as allowed by the law.

Respectfully submitted,

ANDREW E. LELLING
United States Attorney

By:  /s/ KUNAL PASRICHA
KUNAL PASRICHA
PHILIP A. MALLARD
KAITLIN O'DONNELL
Assistant United States Attorneys
District of Massachusetts

## **Certificate of Service**

I hereby certify that I submitted this document for electronic filing via the ECF system, which will send an electronic copy to all counsel of record who are identified on the notice of electronic filing.

By: /s/ KUNAL PASRICH
         KUNAL PASRICHA
         Assistant United States Attorney
         District of Massachusetts