UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ELISEO VAQUERANO CANAS,<br>a/k/a PELIGROSO,<br>　　　　　　　　　Defendant. | Case No. 18-cr-10450-MLW-3<br><br>**REDACTED VERSION OF<br>DOCUMENT FILED UNDER SEAL** |

**SUPPLEMENTAL SENTENCING MEMORANDUM**

The United States files this supplemental memorandum to (i) inform the Court about the recent sentencing of ███████████████████████████; (ii) inform the Court that the government has evaluated its sentencing position in light of recent sentencings and continues to believe that the 18 U.S.C. § 3553(a) factors support a sentence of 50 years in custody for Eliseo Vaquerano a/k/a Peligroso; and (iii) attach additional exhibits that further support the information in Vaquerano's PSR and may be part of the government's sentencing presentation.

**I.    The Recent Sentencing of ███████████.**

Since the last sentencing in this case, ████████████████████████████████████████████████████████████████████████, was sentenced by the Hon. ███████████ to █ years in custody. The government notes a few points about this sentencing:

*First*, notwithstanding ████████████████████████, this was a contested sentencing hearing and ██████ imposed the government's recommended sentence of █ years, instead of the much lower sentence being sought by the defense. The fact that ██████ received the █-year sentence recommended by the government further indicates that the government's sentencing recommendations have been thoughtful, measured, and

1

individually tailored, and further support the argument that Vaquerano's relative culpability, role in the offense, and aggravating factors support the government's recommended sentence.

███ being sentenced to █ years in custody is in line with the government seeking a 50-year sentence for Vaquerano. In terms of nature and circumstances of the offense, ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████. In terms of history and characteristics of the defendant, ████████████████████████

███████████████████████████████████████████. Most importantly, ███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████. Conversely, Vaquerano not only declined to cooperate, but he was one of the last defendants to accept responsibility; he continued associating with other MS-13 murderers in prison, including Salvador in particular; and he picked up numerous disciplinary violations while this case was pending.

*Second*, this Court has already found the information provided by ██████ [CW-24], ██████████ [CW-27], and ████████████ [CW-19] to be credible for sentencing purposes at the other sentencings in this case, and the Court does not need additional

information to make such a finding again. For what it is worth, however, ▆▆▆▆ recent sentencing only gives further cause to find him credible vis-à-vis the information about Vaquerano. Specifically, this Court should know that much of the information in Vaquerano's PSR that was incriminating as to both Vaquerano and ▆▆▆▆ was also contained—almost verbatim—in ▆▆▆▆. These paragraphs include Vaquerano PSR, ¶¶ 67-71 (discussing how Vaquerano ▆▆▆▆ recruited and punished CW-19 and spoke about racketeering activity in his presence); Vaquerano PSR ¶¶ 72-73 (summarizing the attempted murder of Victim 30 committed by Vaquerano, ▆▆▆▆); and Vaquerano PSR ¶¶ 74-76 (summarizing another attempted murder committed by Vaquerano ▆▆▆▆). Multiple PSR objections by Vaquerano call into question these types of paragraphs. *See, e.g.*, Vaquerano Objections #15, 16, 17, 18. These objections should be overruled if Vaquerano insists on pursuing them at his sentencing.

The fact that this type of incriminating information was also included against ▆▆▆▆ further adds to its credibility. This was not self-serving and unreliable information provided by a cooperating witness who was hoping to minimize his own role in the conspiracy. This was credible and jointly incriminating information that had a material negative impact on ▆▆▆▆ an *additional grouping for conspiracy to murder* based on these same descriptions, and these attempted murders were part of the reason ▆▆▆▆ imposed the government's recommended sentence ▆▆▆▆. In this case, the government has not sought additional groupings for conspiracies or attempted murders—choosing instead to simply address them as a 3553(a) factor—but that does not mean this information is not reliable. To the contrary, there is reliable information that Vaquerano participated in significant violent conduct even prior to his participation in murder. After all, it is not in dispute that

3

Vaquerano committed enough violence to become a "homeboy" in the MS-13 gang even *prior* to the Rivas murder. *See infra* at pp. 7-8.

## II. The Government Reaffirms Its Sentencing Recommendation.

In addition to Judge ▬▬▬ sentencing an MS-13 member since the last sentencing in this case, Judge ▬▬▬ also sentenced an MS-13 member since the last sentencing in this case. While every defendant is different and each case presents different aggravating and mitigating circumstances, with the benefit of having had recent sentencings of MS-13 defendants before multiple judges in this District, the government has reviewed its prior sentencing recommendation against Vaquerano. After careful review and further deliberation, the government reaffirms its sentencing recommendation of 50 years in custody for Vaquerano. Even putting aside cases before any other judge, the government believes that imposing a sentence of 50 years in custody for Vaquerano would be in line with the other sentences imposed in this case (*i.e.*, life in prison for Salvador Gutierrez, 40 years for Lopez Flores, and 33 years for Tercero Yanes). Vaquerano's role in the offense, history and characteristics, post-arrest conduct, etc., are much closer to Salvador Gutierrez than any other defendant:

Vaquerano had the most horrific and appalling role in the murder of Rivas. Vaquerano played a key role in stabbing and hacking Rivas to death while the victim begged for his life (as opposed to Lopez who did not stab the victim and Tercero who was a secondary participant in the stabbing). CW-24 and CW-27 each also reported how Vaquerano was hacking at the victim while the victim was screaming for mercy from his supposed friend, "Peli." Salvador even described how he and Vaquerano had a bet on who would stab Rivas first, another data point that shows Vaquerano's thirst for brutal and senseless violence. And it was Vaquerano's blows to the victim's head that were so vicious

4

and cruel that parts of the blade of Vaquerano's large knife—which was later recovered from Vaquerano's grandmother's home—were left embedded in the victim's skull.

Further, Vaquerano personally committed multiple brutal acts of violence in the year or so leading up to the Rivas murder. Unlike Tercero, who was trying to use the murder of Rivas to elevate himself to homeboy status, as to Vaquerano, there is no dispute that Vaquerano had committed sufficient violence in furtherance of MS-13's mission that he had earned full "homeboy" status even prior to the murder of Rivas. Even when compared to Lopez, who was otherwise a leader, Vaquerano's conduct raises significant concerns. As to conduct prior to the murder, the evidence shows that Vaquerano played a significant role in recruiting members closer to his age, and the investigation revealed far more instances of young men describing someone like Vaquerano as a recruiting force than someone like Duggins or Lopez. *See, e.g.*, Govt. Ex. 22 at pp. 33-34 (CW-19 describing how he was recruited by Peligroso ); *id.* at 58-59 (same); *id.* at 68 (describing how Peligroso wanted CW-19 to kill him with him). As the Court astutely noted at prior sentencings, people who are peers or closer in age often have a much more impactful influence on others, and here, the evidence shows that Vaquerano was an animating force in the Sykos clique.

Relatedly, even though Lopez was also a homeboy prior to the murder (while Tercero and Reyes were not), the evidence does not show Lopez's personal participation in violence in the leadup to the murder, as opposed to Vaquerano, who was described as participating in multiple attempted murders and acts of violence in the year or so leading up to the Rivas murder. *See generally* Vaquerano PSR (describing the participation of various co-conspirators in racketeering activity in 2017-2018). Here, it is especially troubling that in addition to Vaquerano's described role in various violent incidents in

5

2017-2018 leading up to the murder, the evidence also indicates that Vaquerano became an *MS-13 member in El Salvador* and received sufficient status through his activities there that the Sykos clique in Massachusetts was able to call up MS-13 leaders in Maryland to confirm Vaquerano's prior membership in MS-13. *See* Vaquerano PSR, ¶¶ 138-139. *See infra*, § III (attached FBI proffer reports on some of these issues). This is a deeply troubling and uncommon allegation. The government has not received information about any of Vaquerano's co-conspirators in the Sykos clique becoming MS-13 members in El Salvador or being blessed by leadership outside Massachusetts for induction as an MS-13 homeboy.

Finally, the government notes that unlike someone like Lopez, who was described by the Warden at Wyatt as a model inmate—a fact that the Court appropriately considered as a mitigating factor in crafting its sentence against Lopez—Vaquerano has had a deeply troubling disciplinary history that mirrors someone like Salvador as opposed to someone like Lopez. *See* Vaquerano PSR, ¶6 (summarizing numerous disciplinary infractions, including multiple infractions in 2019, multiple infractions in 2020, and multiple infractions in 2021); Vaquerano PSR, ¶ 167 (describing an open case for assault in Rhode Island state court for an assault committed at Wyatt). Vaquerano has picked up *multiple disciplinary infractions* in custody, including a *new criminal arrest for assault* in prison, as well as disciplinary violations for misconduct that he committed *with* Salvador at Wyatt. *See infra*, § III (attaching disciplinary records); Govt. Ex. 34.

The fact that Vaquerano and Salvador received disciplinary tickets both for tattooing and being tattooed by each other (and the fact that Vaquerano and Salvador each picked up new charges for assault) while in custody for murder further supports the government's argument that Vaquerano is most similar to Salvador in terms of post-arrest

conduct. The government had also previously seen indicia of Vaquerano and Salvador remaining close even after their arrests. For example, the government learned during this investigation that inmates at Wyatt now have access to tablets (similar to iPads). These tablets, among other things, give inmates access to video chats. (More on that below, on p. 11-12, as to video chats of Vaquerano). The government has occasionally obtained copies of some of these chats given its significant unease about MS-13 defendants being able to communicate in this manner (in addition to their ability to send text messages, make calls, etc., both domestically and internationally). When reviewing one of Salvador's chats approximately a year ago, the government noted Vaquerano in the background of Salvador's chat. For illustrative purposes only, here are screenshots from a Dec. 11, 2020 video chat of Salvador:

 

The government does not intend to introduce this video at sentencing but is using this to simply illustrate Vaquerano's continued association and friendship with Salvador while in custody. Vaquerano is not someone who had a one-off lapse in judgment and then had some epiphany or immediate remorse or deep regret. Vaquerano is someone who was extremely culpable and active in the charged RICO conspiracy, someone who participated

in significant violence even prior to his participation in murder, someone who had the most troubling role out of all in the actual murder, and someone who continued to misbehave and associate with other MS-13 members even after his arrest. The § 3553(a) factors call for Vaquerano to receive the second-highest sentence in this case.

### III. Additional Exhibits

Vaquerano's membership in MS-13 and his role in the horrific murder of Rivas will certainly be the primary factor in the Court's sentencing analysis, but the government is also mindful of the attention the Court has given at the sentencing hearings to try to understand each defendant's background, and to try to understand what a defendant's conduct prior to and after the murder might say about him. To that end, attached are a few additional exhibits that may be referenced at Vaquerano's sentencing hearing, all of which further supports the government's recommendation of 50 years in custody.

*First*, attached as Exhibit 34 are *excerpts* of Vaquerano's disciplinary records obtained from Wyatt. As argued above, Vaquerano's post-arrest conduct provides significant reasons to be concerned about him and to be highly skeptical of the mitigating arguments he is now making. His conduct at Wyatt makes him anything but a model inmate and gives cause to impose a higher sentence than Lopez received and close to the sentence that Salvador received. *See, e.g.*, Ex. 34, Vaquerano-Records-007 (report summarizing tattoo paraphernalia found in cell of Vaquerano and Tercero); *id.* at Records-0037-39 (report summarizing Vaquerano being caught tattooing Salvador's arm); *id.* at Records-29-31 (pictures of an MS-13 symbol on the jail wall and also the new tattoo by Vaquerano on Salvador's arm); *id.* at Records-0075-76 (report of Vaquerano fighting someone he claimed was a rival gang member); *id.* at Records-0086-87 (report summarizing assault by Vaquerano that led to additional criminal charges); *id.* at

Records-0089-90 (report of Vaquerano being caught getting tattooed by Salvador); *id.* at Records-0094 (report of Vaquerano in possession of a manufactured weapon).

Relatedly, the government notes that Vaquerano objected to Probation's summary of his infractions while in pretrial custody and tried to explain them by arguing that these infractions show a "reassuring trajectory." *See* PSR Objection #2. Vaquerano's conduct in custody is anything but reassuring. The defense also argued that these incidents occurred when Vaquerano was "navigating self-preservation and group affiliation in the custodial context," and that he had some type of breakthrough in Spring 2021 that led to him being without any infractions for the 8 months prior to the PSR being written in December 2021. *See id.* That does not appear to be the case either. Last week, the government issued a subpoena to Wyatt for updated disciplinary records. The PSR stated that Vaquerano had not had a disciplinary infraction since Spring 2021, but the recent records include another incident from September 2021. *See* Ex. 34, last two pages. Vaquerano's disciplinary record is deeply troubling, and even while awaiting sentencing for murder, Vaquerano does not appear to be able to conform his conduct to the law.

*Second*, there is cross-corroborating evidence that Vaquerano engaged in significant violence even prior to the Rivas murder. The government does not wish to inundate the Court with interview reports relating to Vaquerano's propensity for violence, but in case Vaquerano insists on trying to cleanse his PSR of his offense conduct or insists on pursuing his objections to his participation in the attempted murder of Victim 30 (Vaquerano PSR, ¶¶ 72-73) or the attempted murder of "Nemo" (Vaquerano PSR, ¶¶ 74-76), the government attaches two FBI proffer reports as a sample: attached as Ex. 35 is a proffer report of CW-27 in which he describes the attempted murder of Victim 30. *See* Ex. 35, p. 8 (other reports about this attack are also available). Attached as Ex.

9

36 is a proffer report of CW-24 ▮▮▮▮ in which he describes the attempted murder of Nemo. *See* Ex. 36, pp. 1-3. For the court's convenience, the discussion of Vaquerano is highlighted in each report.

*Third*, in case there is a discussion at sentencing about Vaquerano's prior membership in MS-13, attached as Ex. 37 is a proffer report of CW-24 ▮▮▮▮ in which he describes some of the things he learned about Vaquerano's prior membership in MS-13. *See* Ex. 37 at p. 8; *see also* Ex. 36 at p. 4. CW-24's information on this point appeared credible to law enforcement because CW-24 not only described some of what he knew about Vaquerano's past and Vaquerano's connection to a particular MS-13 gang member from El Salvador, but CW-24 also described for law enforcement how he *personally tattooed* Vaquerano's chest as an homage to the MS-13 member in El Salvador that Vaquerano was trying to honor. *See* Ex. 37 at p. 8. CW-24 then helped law enforcement find the YouTube video that showed the El Salvador gang member whose tattoo CW-24 used as an inspiration to tattoo Vaquerano. *See id.* This YouTube video was produced in discovery and a simple screenshot serves the illustrative purpose:

 

[Screenshot from YouTube video identified by CW-24 on left.
Picture of tattoo given to Vaquerano by CW-24 on right.]

There is significant reason to find CW-24 credible, especially as it relates to first-hand information that he provided about Vaquerano. *See also* Vaquerano PSR, ¶ 183 (noting that Vaquerano and ███ *lived together* for most of the year leading up to the murder).

*Fourth*, the government highlights certain information obtained recently that further calls into question the mitigating arguments advanced by Vaquerano. As part of the subpoenas to Wyatt to confirm the disciplinary records of Vaquerano, the government also sought copies of his recent electronic and phone communications. Two things stand out that strongly counter the notion that Vaquerano had a difficult and traumatic background (at least compared to countless others from similar places) or that his lack of meaningful support (at least compared to countless others from similar communities) somehow contributed to Vaquerano becoming an MS-13 member and murderer:[1]

- First, the records show that Vaquerano has had *significant and continuous emotional support* from his family throughout his time in custody. In fact, this significant support and contact has seemingly continued even though his immediate family is in El Salvador. In the past month alone, Vaquerano has apparently had *multiple video chats with El Salvador*, along with text and other communications. The government has received from Wyatt copies of numerous video chats that Vaquerano has had with his family, including video chats where his sister, mother, and father can be seen on the screen. It appears that Vaquerano does not go even a few days without communicating with his closest family—and

---

[1] *See, e.g.*, Vaquerano PSR Objection #24 (disclaiming any MS-13 membership in El Salvador and claiming that "It was only when arriving at Chelsea High School, where he found himself not speaking the language, *not having meaningful support or interventions*, isolated and fearful of other gangs, that he finally capitulated to allying himself with other teenagers (and later, adults) who claimed gang affiliation/identity.") (emphasis added).

all this is while he is in custody for murder. There is significant reason to be skeptical about any mitigating arguments based on the supposed lack of love or meaningful support from his family.

- Secondly, the records show that Vaquerano has had *significant and continuous financial support* from his family throughout his time in custody. The government has obtained records of the transaction history of Vaquerano's inmate accounts while in custody. The government has produced these to the defense and is not attaching the voluminous records here, but is attaching as Ex. 38 a summary chart it has created of the deposits made to Vaquerano's inmate account(s) since his arrest. Staggeringly, the records show that Vaquerano's extended family has made dozens of deposits in his name over the years, and he has received funds in his inmate account of *approximately $7,500* during his time in custody. It appears that every month in custody, Vaquerano has had some family member putting money into his inmate account for food or entertainment while in custody.

The government cannot recall another defendant in this or related cases who has had this level of emotional and financial support from his family (and in this case, seemingly from both his immediate and extended family). If anything, Vaquerano's background is an aggravating—not a mitigating—factor.

Vaquerano is also someone who—unlike his co-conspirators (or the victim) in this case who were born in El Salvador—did not come to the United States under especially troubling circumstances. He did not come to the United States by foot through Mexico under traumatic circumstances. He was not smuggled into the country by a "coyote." He did not come seeking asylum. He came to the United States on a plane on a tourist visa. As the PSR notes in discussing his background, "The defendant never suffered any

12

financial hardship." Vaquerano PSR, ¶ 175. In fact, immigration records show that Vaquerano's father, mother, sister, and brother have each visited the United States from El Salvador on multiple occasions in recent years, including at least once during the COVID pandemic.

The fact that someone with that type of family background and support can end up being someone who had arguably the most horrific and sickening role in one of the most gruesome murders in recent Massachusetts history is a deeply troubling fact and only further supports the argument that the 18 U.S.C. § 3553(a) factors call for Vaquerano to receive the second-highest sentence in this case.

## CONCLUSION

For the reasons stated in this sentencing memorandum and those to be advanced at the sentencing hearing, the government respectfully requests that the Court sentence Vaquerano to 50 years (600 months) in custody.

Respectfully submitted,

JOSHUA S. LEVY
Attorney for the United States Attorney
Acting Under Authority Conferred by
28 U.S.C. § 515

By: /s/ Kunal Pasricha
KUNAL PASRICHA
KAITLIN R. O'DONNELL
Assistant United States Attorneys
District of Massachusetts